JS-6

FILED
CLERK, U.S. DISTRICT COURT
DEC 5, 2016
CENTRAL DISTRICT OF CALIFORNIA
BY: BH DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Kimberly Leetzow,
Plaintiff,
v.
Metropolitan Life Insurance Company et al.,
Defendants.

EDCV 15-2468-VAP (KKx)

# ORDER (1) FINDING IN FAVOR OF PLAINTIFF KIMBERLY LEETZOW AND (2) GRANTING ATTORNEYS' FEES

This case arises out of Defendant Metropolitan Life Insurance Company's ("Defendant") denial of Plaintiff Kimberly Leetzow's ("Plaintiff") application for long-term disability benefits. Plaintiff filed this action on December 2, 2015, under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). (Doc. No. 1.) Both parties filed opening trial briefs on August 29, 2016. (Doc. Nos. 23, 25.) The parties then filed their opposition trial briefs on September 30, 2016, and their reply briefs on October 14, 2016. (Doc. Nos. 28–31.)

## I. BACKGROUND

Plaintiff is a former director of sales management who experiences severe, chronic migraines. Plaintiff's illness worsened over time and eventually, she alleges, rendered her unable to work. Accordingly, she applied for disability benefits under a long term disability insurance policy (the "Policy") she purchased from Defendant, an insurance company that provides her employer's group insurance.

United States District Court
Central District of California

Defendant denied Plaintiff's claim, arguing she did not meet the definition of "disabled" under the Policy for the required length of time. After appealing the decision within Defendant's internal appeals system, Plaintiff brought this action to recover the benefits she alleges Defendant owes her.

## II. UNCONTROVERTED FACTS

### A. The Policy

Defendant's Policy provides:

> You [i.e., Plaintiff] will be paid a Monthly Benefit, in accord with Plan Highlights, if we [i.e., Defendant] determine that:
>
> 1. you are Disabled; and
>
> 2. you became Disabled while covered under This Plan.
>
> Benefits will begin to accrue on the date following the day you complete your Elimination Period. Payment of the Monthly Benefit will start on the date one month after completion of the Elimination Period. Subsequent payments will be made each month thereafter. Payment is based on the number of days you are Disabled during each one month period.

(A.R. 788.)

United States District Court
Central District of California

United States District Court
Central District of California

The elimination period is defined as "180 days of continuous Disability" (A.R. 784) and is described as follows:

> Your Elimination Period begins on the day you become Disabled. It is a period of time during which no benefits are payable. Your Elimination Period is shown in Plan Highlights. You must be under the continuous care of a Doctor during your Elimination Period. You may temporarily recover from your Disability during your Elimination Period. If you then become Disabled again due to the same or related condition, you may not have to begin a new Elimination Period.

(A.R. 788.)

Disabled is defined as follows:

> 'Disability' or 'Disabled' means that as a result of Sickness or injury you are either Totally Disabled or Partially Disabled.
>
> 'Total Disability' or 'Totally Disabled' means:
>
> During the Elimination Period and the next 24 months, you are unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue your Usual Occupation in the usual and customary way.

United States District Court
Central District of California

(A.R. 771.)

"Substantial and Material Acts" and "Usual Occupation" are defined as follows:

> "Substantial and Material Acts" means the important tasks, functions and operations generally required by employers from those engaged in your Usual Occupation that cannot be reasonably omitted or modified. In determining what substantial and material acts are necessary to pursue your Usual Occupation, we will first look at the specific duties required by your job. If You are unable to perform one or more of these duties with reasonable continuity, We will then determine whether those duties are customarily required of other employees engaged in your Usual Occupation. If any specific, material duties required of you by your job differ from the material duties customarily required of other employees engaged in your Usual Occupation, then we will not consider those duties in determining what substantial and material acts are necessary to pursue your Usual Occupation.
>
> "Usual Occupation" means any employment, business, trade or profession and the Substantial and Material Acts of the occupation you were regularly performing for the Employer when the Disability began. Usual Occupation is not necessarily limited to the specific job that you performed for the Employer.

(A.R. 771.)

In sum, the Policy provides Plaintiff will be paid disability benefits if she became disabled—such that she could not perform the "important tasks, functions and operations" required by her usual occupation—while she was insured under the plan and remained disabled continuously throughout the 180-day elimination period.

### B. Background

After earning a bachelor's degree in English from the University of California, Riverside in 1993, Plaintiff began working for CorVel Corp., where she continued working for 21 years and eventually became director of sales management. (A.R. 446, 690.) Since her early 20s, Plaintiff experienced migraines, and she has been under the care of doctors for these migraines since at least 2011. (A.R. 485, 489.)

In late 2011, Plaintiff's migraines began to worsen, and after over-the-counter medications were no longer effective, she was prescribed Vicodin as well as multiple other prescription medications to help ease her migraines. (A.R. 474, 489.) In April 2013, her migraines worsened to the point that she needed to take approximately two weeks off work. (A.R. 453, 455.) Later, in May of the same year, worsening migraines forced Plaintiff to take approximately one month off work. (A.R. 453.) During this time off work, Plaintiff told her Doctor, Joey Gee, that she had "almost daily migraines." (A.R. 334.) Plaintiff's migraines worsened again in June 2013, so much so that she was admitted to the emergency room at Dr. Gee's request. (A.R. 329.) On September 2, 2013, Plaintiff left work due to her migraines and has not returned since. (A.R. 285) At the time she left, she noted she "still [had] between 2–5 migraines per week[, and] the only thing that help[ed was] a quiet, dark room." (A.R. 285.)

United States District Court
Central District of California

United States District Court
Central District of California

The administrative record shows Plaintiff sought medical treatment on the following occasions before she left her employment on September 2, 2013:

April 25, 2011 – Plaintiff treated with Dr. Lawrence Lo complaining of "recurrent blurry vision lasting for hours" and "spots in both eyes, follow[ed] by migraine headaches." (A.R. 475.) Plaintiff was referred to a neurologist and ophthalmologist. (Id.)

November 28, 2011 – Plaintiff treated with Dr. Lawrence Lo for a migraine follow-up appointment. (A.R. 474.) Plaintiff reported she was taking Topamax and had been without migraines for a "few months." (Id.) Plaintiff reported she saw her neurologist but was now was having migraines again. (Id.) Further, these migraines did not respond to Motrin, and Dr. Lo prescribed Plaintiff Vicodin for her migraines. (Id.)

February 17, 2012 – Plaintiff treated with Dr. Neal Hermanowicz and told him "3 to 4 days per week in the past month" she was having migraines that lasted a full day each. (A.R. 493.) The headaches were "sometimes throbbing and associated with both photo- and phonophobia." (Id.) Dr. Hermanowicz recommended Plaintiff receive Botox injections for her chronic migraines. (Id.)

August 24, 2012 – Plaintiff treated with Dr. Hermanowicz and reported her migraines occurred "approximately 4 times per week . . . starting at noon and lasting until she [went] to bed at . . . 9 p.m." (A.R. 496.) She stated her migraine severity is "6/10," and she was "having difficulty at work," having "difficulty with

United States District Court
Central District of California

concentration," sometimes needed "to lie down in her car," and was "concerned about her employment because of the interference of her work performance by the migraine symptoms." (Id.) Dr. Hermanowicz indicated he would treat her with Botox injections to help her migraines. (A.R. 497.) Further, Dr. Hermanowicz wrote a note to "Whom it May Concern" stating:

> Mrs. Kimberly Leetzow is under my care for chronic migraines. Mrs. Leetzow and I are still in the process of attempting to improve control of her symptoms by medication adjustment. Her symptoms from migraine may include headache, malaise, diminished clarity of thought and language disturbance, and light and sound sensitivity. Although the process of improving her symptoms has been slow this is not unusual. I remain optimistic that improvement will be achieved.

(A.R. 506.)

September 14, 2012 – Plaintiff treated with Dr. Lawrence Lo and told him she had a migraine that started the previous day. (A.R. 473.) Dr. Lo prescribed Vicodin and Toradol. (Id.) Further, Dr. Lo filled out a "Disability Certificate," stating Plaintiff was under his care "and was totally incapacitated" from September 14 to September 17, 2012. (A.R. 471.)

September 18, 2012 – Plaintiff treated with Dr. Hermanowicz and reported her migraines had become exacerbated "with increased intensity and persistence" since September 13, 2012. (A.R. 498.) Since prior medications had not helped, Dr. Hermanowicz prescribed Medrol Dosepak. (Id.)

United States District Court
Central District of California

September 24, 2012 – Plaintiff was admitted to the emergency room due to her severe migraines. (A.R. 514.)

October 4, 2012 – Plaintiff attended a follow-up appointment with Dr. Lo, in which she stated she was experiencing a migraine that "[s]tarted 3 weeks ago" and caused her trip to the emergency room. (A.R. 463.) Dr. Lo increased Plaintiff's Elavil dosage and referred her to another neurologist. (Id.)

October 8, 2012 – Plaintiff had an MRI examination of her brain at Corona Advanced Imaging. (A.R. 461.)

November 27, 2012 – Plaintiff treated with Dr. Joey Gee for, among other things, a consultation and Botox injections to treat her migraines. (A.R. 480.)

January 15, 2013 – Plaintiff treated with Dr. Gee, but the record does not state whether she received any treatment or only consulted with Dr. Gee. (A.R. 457.)

February 27, 2013 – Plaintiff treated with Dr. Gee for another Botox injection to treat her migraines. (A.R. 456.)

April 16, 2013 – Plaintiff treated with Dr. Gee and reported "she ha[d] been battling a severe migraine waxing and waning for 2 weeks" and ibuprofen and tramadol did not help her symptoms. (A.R. 362) Dr. Gee prescribed her Lovaza and tramadol. (A.R. 364.)

United States District Court
Central District of California

April 18, 2013 – Plaintiff attended a follow-up appointment with Dr. Gee and told him she had a bad migraine. (A.R. 358.) Dr. Gee prescribed a "Medrol dose pak" and instructed Plaintiff to take a week off of work. (A.R. 359.) The same day, Dr. Gee wrote a letter to "whom it may concern" stating Plaintiff "needs the next 2 weeks off due to medical reasons. She can return earlier if and hwne [sic] stable." (A.R. 455.)

May 13, 2013 – Plaintiff emailed Dr. Gee, stating she "had a migrane [sic] almost constantly since last Wednesday (very short periods of less pain)." (A.R. 357.) She added she "missed work Thursday and Friday" and "[n]othing [was] relieving the pain." (Id.) Plaintiff also asked if there was "anything else that [she could] do short term" and indicated she was also worried about long-term implications of her migraines. (Id.)

May 14, 2013 – Plaintiff treated with Dr. Gee, stating she had a severe migraine that began a week earlier. (A.R. 350.) Dr. Gee injected Plaintiff with ketorotac tromethamine, metoclopramide, and diphenhydramine to treat her migraine. (A.R. 351.)

May 17, 2013 – Plaintiff called Dr. Gee and left a message, while crying, stating she still had a migraine. (A.R. 348.)

May 20, 2013 – Plaintiff treated with Dr. Gee and told him she had a severe migraine that was still ongoing. (A.R. 344.) Dr. Gee again injected Plaintiff with ketorotac tromethamine, metoclopramide, and diphenhydramine. (A.R. 345.) Dr.

United States District Court
Central District of California

Gee also injected Plaintiff with dihydroergotamine mesylate and prescribed migranal nasal spray for Plaintiff to use at home. (Id.)

May 31, 2013 – Plaintiff emailed Dr. Gee, stating she "continue[s] to have almost daily migraines" and she was "still off work." (A.R. 330–31.) Dr. Gee prescribed Plaintiff steroids. (A.R. 330.)

June 1, 2013 – Plaintiff emailed Dr. Gee about a severe migraine, and he instructed Plaintiff to go to the local emergency room to be treated with intravenous infusions, which she did. (A.R. 329.)

### C. Evidence Supporting Plaintiff's Medical Condition During the Elimination Period

Plaintiff last worked on September 2, 2013. (A.R. 225.) She later submitted a long term disability claim to Defendant on April 8, 2014, stating her disability began on September 2, 2013, and informing Defendant this was the last day she was able to work. (A.R. 571.) She indicated her disability was "chronic migraines 2–5 days per week" and noted she had been receiving state disability benefits since September 2, 2013. (Id.) Thus, for the purpose of Plaintiff's long term disability claim, the elimination period started on September 2, 2013, and ended on March 1, 2014. (A.R. 788.)

The administrative record contains the following evidence illustrating Plaintiff's medical condition during the elimination period of September 2, 2013, to March 1, 2014:

September 4, 2013 – Plaintiff emailed Dr. Gee, stating "I'm not doing well and was hoping to get into see you as soon as possible. The DHE is giving me severe gastrointestinal issues and I've been missing work. My employer while sympathetic with my condition needs the job to get done and I'm not able to be there enough to do it." (A.R. 322.)

September 5, 2013 – Plaintiff treated with Nurse Practitioner Kathleen Furlong, who reported Plaintiff had "Chronic migraine without aura." (A.R. 324.) Ms. Furlong injected Plaintiff with Botox to treat her migraines and prescribed her diclofenac. (Id.) Ms. Furlong also wrote a letter "To Whom It May C[o]ncern," stating, "Kim Leetzow was evaluated in Neurology today for chronic symptomtomatic [sic] migraines. She is presently unable to perform work duties. It is medically recommened [sic] she doesn't work at this time. Continues under close medical management and evaluation." (A.R. 327–28.)

September 23, 2013 – Plaintiff treated with Dr. Gee, who noted she had "[m]any bad migraines." (A.R. 313.) Dr. Gee injected Plaintiff with Botox a total of 30 times in her facial and cervical spinal muscles to treat her migraines. (A.R. 314.) Dr. Gee instructed Plaintiff to "[f]ollow up in 3 months." (Id.)

October 24, 2013 – Plaintiff treated with Nurse Practitioner Furlong, stating she had a migraine severity of "4–5/10," which was a "decrease in headache intensity." (A.R. 306.) Ms. Furlong wrote another letter "To Whom It May Concern," stating Plaintiff "was evaluated in Neurology for chronic incapacitating migraines. She is presently under suprevised [sic] medical treatment management and is unable to perform work duties. As of today's office visit and clincial [sic]

United States District Court
Central District of California

evaluation, expected return to work date is January 20, 2014. Please contact office as needed." (A.R. 309.)

December 16, 2013 – Dr. Gee recertified Plaintiff's eligibility for state disability insurance by affirming the following statement: "I certify under penalty of perjury that the patient is unable to perform his/her regular or customary work because of the disabling condition(s) listed above and I have treated the patient within my scope of practice." (A.R. 50–51.) Dr. Gee noted Plaintiff had "persistent cognitive issues with severe headaches" and estimated Plaintiff could not return to work until February 28, 2014. (Id.)

December 27 through 31, 2013 – Plaintiff treated with a health care professional named Chi-Ching Yu, who treated Plaintiff with acupuncture and infrared therapy. (A.R. 452.)

January 2, 2014 – Plaintiff treated with Dr. Gee, who reported Plaintiff "still ha[d] frequent migrain[es], but it is better with BTX-A." (A.R. 63.) Dr. Gee then injected Plaintiff with Botox a total of 35 times into her facial muscles and cervical spinal muscles. (A.R. 64.)

March 11, 2014 – Plaintiff called Dr. Gee, asking if he could update her return to work date, which was listed as February 28, 2014. (A.R. 302.) Plaintiff stated "[t]he Namenda seems to be helping with the frequency [of her migraines]. Maybe 2–3 a week rather than 3–5." (Id.) The same day, Dr. Gee recertified Plaintiff's eligibility for state disability insurance by affirming the following statement: "I certify under penalty of perjury that the patient is unable to perform his/her regular

United States District Court
Central District of California

United States District Court
Central District of California

or customary work because of the disabling condition(s) listed above and I have treated the patient within my scope of practice." (A.R. 53) Dr. Gee noted Plaintiff had "persistent cognitive issues with severe headaches [and] loss [of] informal cognitive ability" and estimated Plaintiff could not return to work until September 2, 2014. (A.R. 52.)

Additionally, on April 29, 2014, Plaintiff filled out a Metropolitan Life Insurance Company personal profile in which she stated she had "not worked since September"; she was "partially or fully disabled" approximately "2–5 days a week"; and "there isn't [a work] accommodation that [she could] think of that would help [when she was] experiencing a migraine." (A.R. 442, 444.) She stated she had received state disability insurance benefits since September 2, 2013, and she was "unable to work" because her "migraines [were] unpredictable and prevent[ed her] from [maintaining] a regular work schedule." (A.R. 444.) Plaintiff stated she had difficulty keeping up with basic housework, "had to let the house go frequently," and needed to limit the distance she traveled away from her home due to her migraines. (A.R. 445.) When prompted to comment on her interests, hobbies, and social activities, Plaintiff stated "most days [she was] not able to do much." (Id.) On May 21, 2014, Plaintiff told Defendant's claims specialist her migraines could last for days and "[Plaintiff] never [knew] when she [was] going to have a migraine, they [were] unpedictable [sic] and debilitating w[h]en they [occured], and she [was] unbale [sic] to work or do anything when they [did]." (A.R. 601.) Further, Plaintiff told the claims specialist she could not "hold a job with the way she [had] to constantly be out of work due to migraines" and she was going to sell her home due to her loss of income. (A.R. 601–02.) Further, on September 8, 2014, Plaintiff wrote a letter to Defendant, stating she had "2–5 migraines per week" from September 2, 2013, until

United States District Court
Central District of California

present and "the only thing that helps is a quiet, dark room" which she could only gain access to now that she was no longer working. (A.R. 285.)

On October 10, 2014, Plaintiff wrote Defendant another letter stating:

> I suffer an average of 2–5 migraines per week. During my migraine episodes I am either totally or 50% disabled and therefore unable to perform my work duties. In addition to the pain, at times I am unable to speak coherently, experience nausea, obscured vision, numbness, and am sensitive to light and sound. My migraines typically last between 4 and 12 hours but I have episodes that last for days. . . . When I went out on disability on 9/2/2013, I was not able to perform my job responsibilities. While my job is mostly sedentary, as noted in your letter dated 9/3/2014, as part of my responsibilities in the corporate office, I led national sales calls, conducted training sessions and interacted with senior management as well as other employees. I was not able to perform my job duties: while experiencing a migraine. . . . Once on disability, I saw my neurologist every 3 months for botox injections and follow-up or sooner if necessary. I also communicated by email and phone regarding my condition because as you can imagine, traveling to and from a doctors' office when having a migraine is challenging."

(A.R. 267–68.)

United States District Court
Central District of California

Plaintiff also kept a log of her migraines, which she provided to Defendant. (A.R. 233.) In total, Plaintiff documented 43 days she was experiencing migraines over the 180-day elimination period. (A.R. 233–46.) In the log, Plaintiff designated 10 of the migraines "severe," 22 of the migraines "moderate," 10 of the migraines "mild," and one of the migraines "mild/moderate." (Id.) Although Plaintiff did not enter any values in the "disability time" field in the migraine log (save for 7 hours entered for her February 10, 2014 migraine), she stated each of the migraines, even the ones marked as "mild," disabled her for at least some period of time. (A.R. 55.) In a later email to Defendant, Plaintiff clarified what she meant by her mild, moderate, and severe classifications: she stated "[d]uring the March 2013 to September 2014 time period I had at least 50 migraines. In my log I have 39 of those designated as moderate which would be up to 8 hours of disability per migraine and 11 severe which would be more than 8 hours per migraine." (A.R. 69.)

Dr. Gee also wrote a letter on November 19, 2014, stating, "[Plaintiff] has been persisting to miss up to 10 days per month and more of potential work due to her migraine attacks, through March 2013 to the present. She could miss up to 15 to 20 days per months [sic]." (A.R. 76, 89.) Dr. Gee wrote another letter on December 29, 2014, stating, "[b]ased on her headache diaries, she has been suffering from up to 10 days per month to up to 20 days when most severe. The attacks are disabling when the [sic] appear. . . . She is doing better compared to the peak of the problem, but medically she is unable to perform her occupation to the best of her ability continuously for the past 2 years." (A.R. 42.)

United States District Court
Central District of California

### D. Defendant's Consultants' Reports

When evaluating Plaintiff's claim for benefits under the Policy, Defendant had Plaintiff's medical records reviewed by a nurse consultant. After reviewing Plaintiff's files, the nurse consultant wrote a report stating:

> The medical on file is very limited and there are only 2 OV notes from DOD to present time. There is 1 OV note of 9/23/13 and one from 1/2/14. EE has had a hx. of migraines prior to her disability for yrs and it is unclear what changed in her condition now and who even took her OOW on 9/3/13. There is medical from 2011, 2012 but this is prior to EE's disability. There is an MRI which was normal but this again was from 2012, there are no diagnositic [sic] tests from any provider since disability date of 9/3/13. HCP noted 9/23/13 that memory is intact, no motor or sensory deficits, cranial nerves intact, alert, language w/o deficits, norm. attention, reports chronic migraine w/o aura, had Botox inj. no gait disturbance, Meds- asa, tramadol, migranal, lovaza, metoclopramide, cyproheptadine. The OV note of 1/2/14 stated EE better, but still gets ha., trial of memantine to be started, Botox inj. given. Dr. Gee gave r/l for no climb, can sit, stand, walk interm w/ 15 min. break, lift/carry, push/pull 10 lbs interm. can drive, has not rwached [sic] MMI, but did not send any OV notes to accompany the r/l which are dated 4/23/14. This information does not support the entire EP due to limited medical and tx. plan. It is unclear who took EE OOW and as noted prior what changed in her condition since she had these migraines for yrs and was working. There are no abn. MRI's or CT scans of the brain. There is no migraine/headache log noted.

(A.R. 657–58.)

Based on the nurse consultant's report, Defendant denied Plaintiff's claim for benefits on September 3, 2014. (A.R. 372.) After Plaintiff sent Defendant additional medical records, the nurse consultant reviewed them and wrote, "[u]pdated medical records reviewed. NC and UL feel medical on file is insufficient to support EEs disability from DLW through EP, and does not show a progression or deterioration of sx that would support EEs inability to continue working." (A.R. 682.) Accordingly, Defendant denied Plaintiff's claim again on September 24, 2014. (A.R. 283.)

When Plaintiff appealed Defendant's decision, Defendant sent all Plaintiff's medical records and Plaintiff's migraine log to an independent physician consultant, Dr. Diane Wolf. (A.R. 194–208, 214–65.) Dr. Wolf reviewed all the medical records, called Dr. Gee and Ms. Furlong, and wrote a report detailing her opinion that Plaintiff was not continuously disabled throughout the elimination period. (A.R. 206.) Dr. Wolf stated, "[t]he available information does not support continuous functional limitations for headaches during the dates under review." (Id.) Specifically, Dr. Wolf noted:

> Following administration of Botox in September 23, 2013 the claimant reported October 24, 2013 decrease in headache intensity. . . . March 19, 2014 claimant reported to Dr. Gee, neurology, that she had fewer migraines. . . . Per submitted headache logs reports (as summarized by MetLife staff)

United States District Court
Central District of California

United States District Court
Central District of California

September 23, 2013 through October 22, 2013, October 23, 2013 through November 21, 2013, November 22, 2013 through December 21, 2013 claimant reported no disability hours during these months although headaches were reported. . . . Medical records do not confirm that the claimant had cognitive loss. When seen March 19, 2014 (no headache documented at time of evaluation) and June 19, 2014 (no headache documented at time of evaluation) by Dr. Gee she was alert and oriented. Knowledge was intact. She had normal attention span and concentration. May 20, 2013, prior to the dates under review, when seen during what was documented to be a bad, ongoing migraine the claimant reportedly had intact memory, was alert and oriented, knowledge was intact. There were no language deficits and should [sic] normal attention span and concentration. . . . There are inconsistencies in the available medical information. Ms. Furlong, NP, neurology wrote a letter October 24, 2013 reporting that the claimant was being evaluated for chronic incapacitating migraines. On that same date the claimant had an office visit reporting a decrease in headache frequency since the last office visit September 23, 2013. On that day headache pain was reported to be in the moderate range with no documentation of incapacity from headaches. Headaches are self-experienced phenomena and typically the neurological examination is normal. The incidence of clinically important findings on neuroimaging studies is low. Headaches generally do not totally restrict people from

United States District Court
Central District of California

functioning at home or in the workplace, although there may be days when they are more severe and a person is unable to function for a period of hours to a few days.

(A.R. 206–07.)

Based on Dr. Wolf's report, Defendant denied Plaintiff's appeal on November 12, 2014. (A.R. 126.) Plaintiff then brought this suit on December 12, 2015, requesting the Court order Defendant to pay Plaintiff benefits under the Policy. (Doc. No. 1.)

## III. LEGAL STANDARD

Here, the parties stipulated this matter should be adjudicated de novo. (Doc. No. 27 at 2.) "The District Court's de novo review of the parties' submissions and resolution thereof, can best be understood as essentially a bench trial on the papers with the District Court acting as the finder of fact." Porco v. Prudential Ins. Co. of Am., 682 F. Supp. 2d 1057, 1071 (C.D. Cal. 2010) (internal quotation marks and alterations omitted); see Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094–95 (9th Cir.), cert. denied, 528 U.S. 964 (1999) (holding, in an ERISA disability benefits case, that "in its discretion, . . . the district court may try the case on the record that the administrator had before it"). When review is de novo, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Const. Mgmt. Inc., 623 F.3d 1290, 1295–96 (9th Cir.2010); see Polnicky v. Liberty Life Assurance Co. of Bos., 2014 WL 6680725, *7 (N.D.Cal.2014) ("When conducting de novo review of a decision by an

United States District Court
Central District of California

ERISA plan administrator, the Court has a responsibility to undertake an independent and thorough inspection of the decision"); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (when a court must review the denial of benefits de novo, the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits").

"A plaintiff challenging a plan administrator's decision bears the burden of proving entitlement to benefits by a preponderance of the evidence." Jahn-Derian v. Metro. Life Ins. Co., No. CV 13-7221 FMO (SHx), 2016 WL 1355625, at *5–6 (C.D. Cal. Mar. 31, 2016). The Court "evaluate[s] the persuasiveness of conflicting testimony and decide[s] which is more likely true." Kearney, 175 F.3d at 1095; see Schramm v. CNA Fin. Corp. Insured Grp. Benefits Program, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010) (in reviewing the administrative record, "the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate").

## IV. DISCUSSION

The sole dispute here is whether Plaintiff was "totally disabled" during the elimination period, as defined in the Policy. (Doc. No. 25 at 14, 17.) The parties agree that Plaintiff was disabled from March 22, 2014, onward. (Doc. No. 29 at 6.) The Court finds that Plaintiff was "totally disabled" both during and after the elimination period, and the great majority of the evidence supports this conclusion.

### A. Defendant's Arguments

Defendant argues the administrative record shows Plaintiff was not disabled because (1) "[c]ourts have recognized that a claimant's subjective reports of pain do

not establish disability where, as is the case here, other evidence in the record supports a finding to the contrary; (2) "Plaintiff's own headaches logs reflected periods of self-reported 'disability' totaling only seven (7) hours during the entire elimination period"; (3) "Plaintiff saw Dr. Gee only four times during the 180-day elimination period"; (4) "Plaintiff sought no other medical care (e.g. a second opinion from someone other than Dr. Gee) during that period"; and (5) "Dr. Gee administer[ed] Botox injections that he reported reduced the frequency of Plaintiff's migraines and led Plaintiff to report that she was doing better." (Doc. No. 25 at 14.) The Court addresses each of Defendant's arguments in turn.

**1. "Courts have recognized that a claimant's subjective reports of pain do not establish disability where, as is the case here, other evidence in the record supports a finding to the contrary," and the "the objective medical evidence in the record" shows Plaintiff was not disabled.**

Defendant argues "[c]ourts have recognized that a claimant's subjective reports of pain do not establish disability where, as is the case here, other evidence in the record supports a finding to the contrary," and the "the objective medical evidence in the record" shows Plaintiff was not disabled. (Id.) The Court, however, finds this argument unconvincing. Defendant unsuccessfully proffered this very argument in the recent case Jahn-Derian v. Metro. Life Insurance Co., No. CV 13-7221 FMO (SHX), 2016 WL 1355625 (C.D. Cal. Mar. 31, 2016). In that case, an insured attempted to recover benefits for her "severe, increasing chronic pain in the neck . . . [and] upper extremities" that prevented her from working. Id. at 3. Defendant argued the insured "lacked objective proof that her pain rendered her 'totally disabled'" because Defendant's physician consultants concluded "there



United States District Court
Central District of California

United States District Court
Central District of California

were 'no significant neurological abnormalities on physical exam[,] . . . there was insufficient 'clinical evidence' to support any further restrictions or limitations[, and] . . . [the insured's claim was based] entirely on her subjective self-reports as adopted by her treating physician." Id. at 6. The Jahn-Derian court, however, found these arguments "unpersuasive." Id. Specifically, the court noted Defendant "d[id] not point to any language in the Plan that require[d] a beneficiary to prove she [was] 'totally disabled' solely by objective evidence." Id. Additionally, citing a deluge of similar cases, the court ruled Defendant's position was inherently illogical, holding:

> In the context of a condition characterized by disabling pain, a treating physician invariably relies on a patient's descriptions of his or her condition and other types of subjective information in making a diagnosis and in assessing a patient's limitations. . . . However, defendant's contention that the Plan requires objective medical evidence in every instance of a claimed disability would mean that an employee with a mental disability or other condition—such as fibromyalgia, migraines and chronic fatigue syndrome—would never qualify for disability benefits because there is often no objective medical evidence to confirm those conditions.

Id.

Here, just as in Jahn-Derian, Defendant has not pointed to any language in the Policy stating "objective medical evidence in the record" is to be trusted over Plaintiff's personal accounts of her migraine-related pain. Further, as migraines are an invisible illness and "there is often no objective medical evidence" to confirm

United States District Court
Central District of California

their existence, patients' personal accounts are the strongest, and often only, evidence of disability in such cases. This point is bolstered by Defendant's independent physician consultant's opinion, which stated migraines "are self-experienced phenomena and typically the neurological examination is normal." (A.R. 206–07.) Indeed, if migraines are a self-experienced phenomena and if they typically cannot be detected by neurological examinations, the only way to learn about their existence or severity is by asking patients. Thus, the Court declines to place more weight on what Defendant characterizes as "objective medical evidence in the record" than Plaintiff's personal accounts of migraine-related pain.

**2. Plaintiff was not continuously disabled during the elimination period because her "own headaches logs reflected periods of self-reported 'disability' totaling only seven (7) hours during the entire elimination period."**

Defendant also argues Plaintiff was not continuously disabled during the elimination period because "Plaintiff's own headaches logs reflected periods of self-reported 'disability' totaling only seven (7) hours during the entire elimination period." (Doc. No. 25 at 14.) This, however, is also unpersuasive. Although Plaintiff may have neglected to enter values for her "disability time" during the elimination period, Plaintiff clearly indicated she had migraines a total of 43 days during the 180-day elimination period. (A.R. 233–46.) Further, Plaintiff stated each of the 43 migraines caused her to be disabled for at least some period of time. (A.R. 55.) Further, of the 43 migraines, Plaintiff designated 23 of them "moderate," and 10 of them severe. (Id.) As Plaintiff later indicated, however, "those designated as moderate . . . would be up to 8 hours of disability per migraine and . . . severe . . . would be more than 8 hours per migraine," this means—at a minimum—Plaintiff

United States District Court
Central District of California

experienced upwards of 80 hours of disability time during the 180-day elimination period. (A.R. 69.) Indeed, the actual number of disability hours during this period would likely be much higher, for each of the 23 "moderate" migraines could be credited with anywhere between zero to eight hours of disability time. Even if the court were to assume a low-end average of two-and-a-half hours of disability time per "moderate" migraine, this would yield a total of 137.5 hours of disability time during the 180-day elimination period. Thus, Defendant's argument that Plaintiff was not continuously disabled during the elimination period because "Plaintiff's own headaches logs reflected periods of self-reported 'disability' totaling only seven (7) hours during the entire elimination period" is unavailing.

**3. Plaintiff was not disabled during the elimination period because she "saw Dr. Gee only four times during the 180-day elimination period;" and "Plaintiff sought no other medical care (e.g. a second opinion from someone other than Dr. Gee) during that period"**

Defendant argues Plaintiff was not disabled during the elimination period because she "saw Dr. Gee only four times during the 180-day elimination period." (Doc. No. 25 at 14.) Defendant also argues, "Plaintiff sought no other medical care (e.g. a second opinion from someone other than Dr. Gee) during that period." (Id.) These arguments lack merit.

First, Plaintiff has a disability, and she has stated this makes it harder for her to initiate, arrange, and attend doctors' appointments. (A.R. 268.) The Court finds this convincing, given evidence in the record showing Plaintiff has chronic, severe migraines that present "persistent cognitive issues with severe headaches [and] loss [of] informal cognitive ability." (A.R. 52.) Thus, failure to attend doctors'

United States District Court
Central District of California

appointments does not diminish Plaintiff's disability claim. In fact, her failure to attend doctors' appointments may evidence that her disability was especially severe.

Further, the record shows Plaintiff experienced migraines for approximately 20 years and underwent aggressive medical treatment, with little improvement, since at least 2011. (A.R. 63, 474, 485, 489.) Because many other doctors had attempted to treat Plaintiff in the past—with very limited success—and the techniques employed by Dr. Gee during the elimination period were not drastically different than those Plaintiff received previously, it is understandable if Plaintiff was not enthusiastic about the prospect of further medical appointments during the elimination period. Indeed, it is not uncommon for people with longstanding illnesses that have not responded to aggressive medical treatment to lose hope in the ability of doctors to improve their situations. Accordingly, a lack of doctors' appointments during the elimination period does not mean Plaintiff was not disabled. In fact, it could mean Plaintiff was so disabled she had temporarily given up hope on doctors' abilities to improve her illness.

Additionally, while the administrative record shows Plaintiff did not travel to Dr. Gee's office more than four times during the elimination period, there is ample evidence in the record showing she actively contacted medical professionals and attended to her illness. Specifically, on September 4, 2013, Plaintiff emailed Dr. Gee requesting treatment (A.R. 322); on September 5, 2013, Plaintiff traveled to Dr. Gee's office for Botox injections (A.R. 327–28); on September 23, 2013, Plaintiff again traveled to Dr. Gee's office for Botox injections (A.R. 314); on October 24, 2013, Plaintiff traveled to Dr. Gee's office and obtained a note describing her disability (A.R. 309); on December 16, 2013, Dr. Gee recertified Plaintiff's eligibility

for state disability, presumably at Plaintiff's request (A.R. 50–51); from December 27 through 31, 2013, Plaintiff attempted treatment with acupuncture and infrared therapy (A.R. 452.); and on January 2, 2014, Plaintiff traveled to Dr. Gee's office for further Botox injections (A.R. 64.) Thus, Defendant's argument that Plaintiff was not disabled during the elimination period because she "saw Dr. Gee only four times during the 180-day elimination period" is unavailing.

Further, Defendant's argument that Plaintiff was not disabled because she "sought no other medical care (e.g. a second opinion from someone other than Dr. Gee) during that period" is similarly unconvincing. The record clearly shows Plaintiff went to numerous doctors in the past for her migraines, including Dr. Lawrence Lo (A.R. 475), Dr. Neal Harmanocwicz (A.R. 496), Dr. Gee (A.R. 329), and various emergency room doctors (A.R. 329, 514). Furthermore, the record shows Plaintiff did indeed seek a second opinion from acupuncturist/infrared therapist Chi-Ching Yu on December 27 through 30, 2013, in the middle of the elimination period. (A.R. 452.)

**4. "Dr. Gee administer[ed] Botox injections that he reported reduced the frequency of Plaintiff's migraines and led Plaintiff to report that she was doing better."**

Defendant argues Plaintiff was not continuously disabled during the elimination period because "Dr. Gee administer[ed] Botox injections that he reported reduced the frequency of Plaintiff's migraines and led Plaintiff to report that she was doing better." (Doc. No. 25 at 14.) This argument is unconvincing for the simple reason that "doing better" does not mean Plaintiff was not disabled. As discussed above, and as will be further discussed below, Plaintiff's migraine log and

United States District Court
Central District of California

United States District Court
Central District of California

medical records provide ample evidence she was continuously disabled during the elimination period. Thus, despite Plaintiff stating she was "doing better," she was still disabled as defined in the Policy.

### B. The Administrative Record Contains Ample Evidence Showing Plaintiff was Disabled During the Elimination Period

The record shows that beginning when she was in her early 20s, Plaintiff experienced migraines, and these migraines worsened beginning in 2011. (A.R. 474, 485, 489.) In the time leading up to the evaluation period, she began needing prescription strength pain killers and other medications for her migraines, and on two separate occasions, she was forced to take periods off work due to her migraines. (A.R. 474, 489.) Specifically, in April 2013 she took approximately two weeks off work and in May 2013 she took approximately one month off work. (A.R. 453, 455.) Also, in the time leading up to the elimination period, she was admitted to the emergency room twice. Once, on October 4, 2012, she was admitted to the emergency room for a migraine that "started 3 weeks" earlier, and on June 1, 2013, she was admitted to the emergency room on Dr. Gee's request to receive intravenous infusions. (A.R. 329, 463.) Between April 25, 2011, and September 2, 2013, the beginning of the elimination period, Plaintiff sought treatment for her migraines approximately 15 times. (See Section II(B) supra.) During this time, the administrative record shows Plaintiff tried a multitude of medications for her migraines, including Topamax, Botox, Vicodin, Toradol, Lovaza, tramadol, Medrol dose packs, ketorotac tromethamine, metoclopramide, diphenhydramine, and steroids, among others. (Id.) Despite all the treatment Plaintiff received, her migraines persisted, and they caused her malaise, diminished her clarity of thought,

United States District Court
Central District of California

caused language disturbance, and made her sensitive to light and sound. (A.R. 329, 506.) At times, the migraines rendered Plaintiff "totally incapacitated" and drove her to tears. (A.R. 348, 471.) In short, the evidence regarding the time leading up to the elimination period shows Plaintiff's migraine symptoms were persistent, resistant to treatment, at times crippling, and progressively worsening. In short, the evidence paints a picture of a woman struggling to keep up with the demands of her job as her illness progressed and eventually failing as the symptoms became too much to bear.

On September 2, 2013, the elimination period began. Immediately thereafter, Plaintiff saw Dr. Gee's Nurse Practitioner Ms. Furlong, who, after examining Plaintiff, wrote a note stating Plaintiff "is presently unable to perform work duties. It is medically recommend [sic] she doesn't work at this time." (A.R. 327–28.) On September 23, 2013, Plaintiff saw Dr. Gee again, who noted she had "[m]any bad migraines" and proceeded to inject Plaintiff with Botox 30 times in her facial and cervical spinal muscles to treat her migraines. (A.R. 314.) Although, Dr. Gee asked Plaintiff to follow up in three months, Plaintiff came back to his office the following month, on October 24, 2013. (A.R. 306.) The same day, after examining Plaintiff, Ms. Furlong wrote another note stating Plaintiff "is presently under supervised medical treatment management and is unable to perform work duties. As of today's office visit and clinical evaluation, expected return to work date is January 20, 2014." (A.R. 309.) On December 16, 2013, Dr. Gee certified, under penalty of perjury, Plaintiff was "unable to perform his/her regular or customary work because of" her migraines, and Dr. Gee stated he did not expect Plaintiff to be able to return to work until February 28, 2014. (A.R. 50–51.) On December 27 through 31, Plaintiff even availed herself to alternative medicine in an attempt to relieve her debilitating

migraines. (A.R. 452.) Shortly afterwards, on January 2, 2014, Plaintiff again received 35 Botox injections into her facial muscles and cervical spinal muscles. (A.R. 64.) During the 180-day elimination period, Plaintiff's migraine log shows she experienced migraines for 43 days. (A.R. 233–46.) Plaintiff indicated each of the 43 migraines caused her to be disabled for at least some period of time. (A.R. 55.) Further, Plaintiff designated 23 of these migraines "moderate," and 10 of them severe, indicating "those designated as moderate . . . would be up to 8 hours of disability per migraine and . . . severe . . . would be more than 8 hours [of disability] per migraine." (A.R. 69.)

Immediately after the elimination period ended on March 1, 2014, Plaintiff saw Dr. Gee, informing him her migraines recently occurred "maybe 2–3 a week rather than 3–5." (A.R. 302.) Tellingly, the same day Dr. Gee certified again, under penalty of perjury, that Plaintiff was "unable to perform his/her regular or customary work because of" her migraines; that Plaintiff had "persistent cognitive issues with severe headaches [and] loss [of] informal cognitive ability"; and that he believed she could not return to work until September 2, 2014. (A.R. 52–53.) Further, Plaintiff consistently maintained she was disabled during the elimination period, and on two separate occasions, Dr. Gee wrote letters stating Plaintiff "has been persisting to miss up to 10 days per month and more of potential work due to her migraine attacks, through March 2013 to the present" and "[b]ased on her headache diaries, she has been suffering from up to 10 days per month to up to 20 days when most severe." (A.R. 42, 89, 76.)

Further, Plaintiff argues the amount of time she needed to take off work due to migraines and the length of time her migraines incapacitated her are strong

United States District Court
Central District of California

United States District Court
Central District of California

indicators she was disabled during the elimination period. (Doc. No. 23 at 27.) As discussed above, Plaintiff noted she had migraines 43 days during the 180-day elimination period and stated each of the 43 migraines caused her to be disabled for some time. (A.R. 55, 233–46.) Also, based on Plaintiff's statements about the length of time each migraine incapacitated her, even a conservative estimate would yield 137.5 hours of disability time during the 180-day elimination period. Given that Plaintiff reported her migraines often "start[ed] at noon and last[ed] until she [went] to bed at . . . 9 p.m.," many of these migraines would have incapacitated her during hours she would need to be at work. (A.R. 496.) Further, in the six months before the elimination period, Plaintiff's migraines forced her to take approximately six weeks off from work. (A.R. 453, 455.) If this trend continued into the elimination period, Plaintiff would have missed on average approximately four days of work per month. As Plaintiff noted, in the Social Security context, missing work more than two days a month is often enough to show one is disabled. Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) ("the vocational expert noted that absence from the workplace two or more days a month would disqualify Bruce from gainful employment at any job"); Hill v. Astrue, 698 F.3d 1153, 1162 (9th Cir. 2012) ("it would not be possible to engage in substantial gainful activity with absences of" two to four days per month). Although the Court notes the standard for disability is different in Social Security cases than it is here, the Court finds such absenteeism is strong evidence of Plaintiff's disability.

On the other hand, Defendant's nurse consultant noted, "EE has had a hx. of migraines prior to her disability for yrs and it is unclear what changed in her condition now." (A.R. 657–58.) As discussed above, however, Plaintiff's condition gradually worsened approaching September 2, 2013, as

United States District Court
Central District of California

she had to take time off work the spring and summer before the elimination period. Further, although Plaintiff decided to declare September 2, 2013, her first day of disability for the purposes of her insurance policy, it is entirely likely that she was "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue" her job even before this, as was evidenced by her long absences from work in the spring and summer. Hence it was not necessary for Plaintiff's condition to abruptly change on September 2, 2013, for her to be disabled for the entirety of the elimination period. Additionally, although the nurse consultant reported Plaintiff's records showed "that memory is intact, no motor or sensory deficits, cranial nerves intact, alert, [and] language w/o deficits," none of these observations suggest Plaintiff's migraines were not preventing her from doing her job. (A.R. 657–58.) Also, although the nurse consultant pointed out some of Plaintiff's medical records indicated she had "norm. attention," (id.) this statement is directly contradicted by Dr. Gee's subsequent notes (A.R. 42, 76, 89) and Plaintiff's assertions (A.R. 267–68).

Similarly, Dr. Wolf's report echoed the nurse consultant's above points and also stated, "[p]er submitted headache log[] reports (as summarized by MetLife staff) September 23, 2013 through October 22, 2013, October 23, 2013 through November 21, 2013, November 22, 2013 through December 21, 2013 claimant reported no disability hours during these months although headaches were reported." (A.R. 206–07.) Again, as discussed above, although Plaintiff did not include her disability hours into her log for that period, she made clear each of her 43 migraines during the elimination period caused her to be disabled for at least some period of time. (A.R. 55.) Additionally, her description of the headaches as

United States District Court
Central District of California

"moderate" and "severe" indicated she had many disability hours during that period. (A.R. 69.)

Dr. Wolf also indicated, "[h]eadaches generally do not totally restrict people from functioning at home or in the workplace, although there may be days when they are more severe and a person is unable to function for a period of hours to a few days." (A.R. 206–07.) This, however, does not support Defendant's position. Indeed the overwhelming evidence from Plaintiff and her doctors, outlined above, shows Plaintiff's migraines did not fit into the "general" category. Indeed, the administrative record shows Plaintiff's migraines were exceptional, disabling, and capable of rendering her "unable to function for a period of hours to a few days." Further, there is no evidence in the record showing Dr. Wolf or Defendant's nurse consultant ever examined Plaintiff; whereas Dr. Gee and Plaintiff's other doctors examined her many times and concluded she was disabled. The Court is aware the "treating physician" rule is inapplicable to ERISA cases, and a plan administrator is not required to give more weight to an insured's treating physician opinion than an insurer's independent physician consultant's opinion. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 831 (2003). Nonetheless, Defendant has not pointed to—and the Court has not found—any case law stating courts may not consider either (1) the length of time a physician has treated the insured or (2) whether the physician had the opportunity to examine the insured in deciding what weight to give the physician's testimony. <u>See</u> <u>Demer v. IBM Corp. LTD Plan</u>, 835 F.3d 893, 905 (9th Cir. 2016) ("Despite this evidence, MetLife rejected any mental limitations based on the opinions of two IPCs, Drs. Goldman and Dr. Gordan, neither of whom actually examined Mr. Demer."); <u>Backman v. Unum Life Ins. Co. of Am.</u>, No. 14-CV-05433-YGR, 2016 WL 3180016, at *11 (N.D. Cal. June 8, 2016) ("While ERISA

does not accord special deference to the opinions of a treating physician, courts generally give greater weight to doctors who have actually examined the claimant versus those who only review the file, especially when they are employed by the insurer as here.") (citations omitted).

Accordingly, given the above evidence, the Court finds Plaintiff was disabled throughout the entirety of the elimination period and afterwards. Specifically, Plaintiff's disabling migraines rendered Plaintiff unable to perform with reasonable continuity "the important tasks, functions and operations generally required by employers from those engaged in [her] Usual Occupation that cannot be reasonably omitted or modified" in the usual and customary way. (A.R. 771.)

### C. The Court's Holding Applies to the Evaluation Period and the 24-Month "Own Occupation" Period

Plaintiff requests the Court award Plaintiff disability benefits from the end of the elimination period until present. (Doc. No. 28 at 26.) Defendant argues benefits should only be awarded for the 24-month period following the elimination period because a different standard is used to determine whether insureds are eligible for benefits after they have received benefits for 24 months, and Defendant, as the plan administrator, should be allowed to make that determination in first instance. (Doc. No. 31 at 12.)

For the purpose of Plaintiff's long term disability claim, the elimination period ended on March 1, 2014. (A.R. 788.) After the elimination period, Plaintiff is entitled to collect disability benefits for 24 months, while she is unable to perform her "Usual Occupation." (A.R. 771.) After the 24 months, however, the Policy

United States District Court
Central District of California

provides Plaintiff can continue to receive benefits only if she cannot "engage with reasonable continuity in *any occupation* in which [she] could reasonably be expected to perform satisfactorily in light of [her]: age; education; training; experience; station in life; and physical and mental capacity." (Id.) (emphasis added.) Thus, to continue receiving benefits after March 1, 2016, Plaintiff would need to meet the "any occupation" standard.

Plaintiff cites Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154 (9th Cir. 2001), to support her assertion the Court can award Plaintiff benefits after the 24-month period under the "any occupation" standard, without allowing Defendant to make that determination in the first instance. In Grosz-Salomon, a lawyer filed a disability claim and received disability benefits for three years before her insurer declared she was no longer disabled and stopped paying benefits. Id. at 1157–58. Notably, the only definition of "disabled" in the lawyer's policy was an "own occupation" definition, and there was no time period after which the plan administrator needed to determine the lawyer was incapable of performing "any occupation" to continue receiving benefits. Grosz-Salomon v. Paul Revere Life Ins. Co., No. CV 98-7020 DDP (RNBx), 1999 WL 33244979, at *4 (C.D. Cal. Feb. 4, 1999), aff'd, 237 F.3d 1154 (9th Cir. 2001). After finding the insurer erroneously stopped paying benefits and the lawyer was disabled, the court reinstated benefits through the date of decision, instead of remanding the case to the insurer to make another decision as to whether the lawyer was disabled. Id. at 1162. The rationale for such was the insurer "did not misconstrue the definition of 'disabled,' or apply the wrong standard to evaluate [the lawyer's] claim. It applied the right standard, but came to the wrong conclusion. [And thus, u]nder these circumstances, remand is not justified. Retroactive reinstatement of benefits was proper." Id. at 1163.

United States District Court
Central District of California

United States District Court
Central District of California

Grosz-Salomon, however, is distinguishable from the present case because in Grosz-Salomon the court reviewed only the plan administrator's decision that the lawyer was incapable of performing her "own occupation," and this was the only determination necessary under her policy for her to continue receiving benefits until the date of judgment. In other words, the lawyer's policy required only one finding from the plan administrator, which the administrator made and the court reversed.[1] Thus, Grosz-Salomon does not stand for the proposition that a court can make a disability finding that a plan administrator has not determined in the first instance. Indeed, if a district court's function is to "review" the plan administrator's determinations, even if the "review" is de novo, a district court cannot "review" a decision which has not yet been made. See Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 962 (9th Cir. 2006). Here, unlike Grosz-Salomon, Plaintiff's Plan requires two separate findings for Plaintiff to continue receiving benefits from the end of the elimination period through present. Namely, the plan administrator must find Plaintiff is unable to perform her "own occupation" for 24 months, and then the plan administrator must find Plaintiff is unable to perform "any occupation" after the 24-month period. Although the Court has reviewed and reversed Defendant's finding on the "own occupation" period, Defendant has not yet made a finding on the "any occupation" period. Further, the Ninth Circuit has held "[i]t is not the court's function *ab initio* to apply the correct standard to [the participant's] claim," at

[1] In Castillo ex rel. Castillo v. CIGNA Healthcare, No. C 98-3868 VRW, 2002 WL 523796, (N.D. Cal. Mar. 29, 2002), the court asserted there is a significant difference between a "a case in which the court's determination whether the plan administrator's decision was correct or incorrect effectively resolves the coverage issue" and a case in which additional determinations need to be made to resolve a coverage issue. Id. at *2.

least where a plan administrator retains discretion to interpret policy provisions. Vizcaino v. Microsoft Corp., 120 F.3d 1006, 1014 (9th Cir. 1997). Here, although Defendant does not retain the discretion the plan administrator had in Vizcaino, the Court declines to depart from the Ninth Circuit's guidance when presented with this similar legal issue.

Additionally, as a practical matter, the Court lacks the evidence to determine whether Plaintiff was unable to perform "any occupation" from March 1, 2016, onward. The most recent notation the Court found in the Administrative Record is dated November 18, 2015, and thus there is no evidence in the Administrative Record on which the Court could determine Plaintiff was unable to perform "any occupation" from March 1, 2016, onward. (A.R. 769.) Indeed, a remand to Defendant to make a determination in the first instance on the "any occupation" standard is necessary to build an administrative record on which the Court can rule. See James v. AT & T W. Disability Benefits Program, 41 F. Supp. 3d 849, 884 (N.D. Cal. June 2, 2014) (holding "remand [was] a useless formality" when "the administrative record is complete").

To support her argument that the Court should award benefits through the present, Plaintiff also quotes Majeski v. Metro. Life Ins. Co., 590 F.3d 478 (7th Cir. 2009), stating "no remand is necessary where the record contains 'such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled.'" (Doc. No. 28 at 26.) The full quote from Majeski reads, "*[t]his is not the rare case where the record before us contains* such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled." 590 F.3d at

484 (emphasis added). Also, the immediately preceeding sentence states, "[w]hen a plan administrator fails to provide adequate reasoning for its determination, our typical remedy is to remand to the plan administrator for further findings or explanations." Id. Here, similar to the plan administrator in Majeski, Defendant has not "provided adequate reasoning for its determination" regarding Plaintiff's status under the "any occupation" standard because it has not made any determination under the "any occupation" standard. Thus, like the Seventh Circuit in Majeski, the Court is inclined to remand the case to Defendant to find whether Plaintiff is disabled under the "any occupation" standard in the first instance.

Plaintiff also cites DuPerry v. Life Insurance Co. of North America, 632 F.3d 860 (4th Cir. 2011) in support of her argument that the Court should award benefits through the present. (Doc. No. 28 at 25 n.29.) In DuPerry, like the present case, a plan administrator denied an insured benefits under a "regular-occupation" standard, and the trial court ruled the insured was entitled to benefits under both a "regular-occupation" standard and an "any-occupation" standard, without the plan administrator having made a determination on the "any-occupation" standard in the first instance. Id. at 876. The court reasoned, "while [the insurer] has not yet passed on the question of whether [the insured] could satisfy the any-occupation standard, in this case there is no indication that the change in standard would affect the result. Specifically, it is apparent from the record that [the insured's] inability to work was not the result of particular duties specific to her regular occupation." Id. Further, in DuPerry, one of the insured's doctors "indicated that [the insured] was '[p]ermanently disabled' and that she could '[n]ever' return to work." Id. Here, unlike DuPerry, and as discussed above, the record is devoid of evidence indicating Plaintiff's condition after March 1, 2016. Further, the Court has found no evidence

United States District Court
Central District of California

United States District Court
Central District of California

from Plaintiff's doctors stating she will never be able to return to work. Thus, unlike DuPerry, it is not "apparent from the record" that Plaintiff was disabled under the "any occupation" standard since March 1, 2016.

Accordingly, the Court's decision that Plaintiff is disabled is limited to the "own occupation" standard. Thus, the Court finds Plaintiff was disabled under the "own occupation" standard during the elimination period and the following 24-month period, and the Court REMANDS the case to Defendant to determine whether Plaintiff is disabled after the 24-month period under the "any occupation" standard.

### D. Attorneys' fees

29 U.S.C. § 1132(g) authorizes courts, at their discretion, to award reasonable attorneys' fees and costs to a party.

> factors to be considered in exercising this discretion are:(1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing party would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative legal merits of the parties' positions.

Duggan v. Hobbs, 99 F.3d 307, 314 (9th Cir. 1996)

United States District Court
Central District of California

Here, the administrative record contains an abundance of evidence showing Plaintiff was disabled during the elimination period and afterwards. Nevertheless, Defendant denied Plaintiff the benefits to which she was rightfully entitled during a time when her migraines had largely incapacitated her. Hence, although disability insurance's purpose is to ease the financial hardship associated with becoming disabled, Defendant exacerbated Plaintiff's hardship when she needed assistance most—assistance for which she already paid premiums—and this shows a degree of culpability and bad faith on behalf of Defendant. Further, Defendant does not contest its ability to pay an attorneys' fees award, and such an award would deter Defendant from engaging in similar conduct in the future. Also, given the ample evidence in the administrative record of Plaintiff's disability, Plaintiff's legal position was considerably stronger than Defendant's. Accordingly, the factors weigh in favor of awarding Plaintiff her reasonable attorneys' fees and costs.

## V. DISCOVERY OBJECTION

In support of her trial brief, Plaintiff submitted a copy of her Social Security Disability Insurance benefits determination, which states Plaintiff became disabled on September 2, 2013. (Doc. No. 23-2 at 2.) Defendant objected to this evidence on the grounds it is not included in the administrative record and thus should not be admissible. (Doc. No. 29-1.) As stated above, the administrative record is sufficient on its own to support the Court's findings for Plaintiff. Thus, as the Court has not relied on Plaintiff's extrinsic evidence in this ruling, the Court declares Defendant's objection moot.

United States District Court
Central District of California

## VI. CONCLUSION

For the reasons stated above, the Court finds Plaintiff was totally disabled during the elimination period and 24-month period following the elimination period. Accordingly, Plaintiff shall be granted disability benefits under the Policy from the end of the elimination period through the end of the 24-month period following the elimination period along with prejudgment interest. The Court REMANDS the case to Defendant to determine whether Plaintiff is disabled under the "any occupation" standard. Further, per 29 U.S.C. § 1132(g), Defendant is ordered to pay Plaintiff's reasonable attorneys' fees and costs. Plaintiff is to set the matter for hearing regarding attorneys' fees and costs.

**IT IS SO ORDERED.**

Dated: 12/5/16

Virginia A. Phillips
Chief United States District Judge